2004 UT 95

**STATE of Utah, Plaintiff and Respondent,**

v.

**Angie BRAKE, Defendant and Petitioner.**

**No. 20020594.**

Supreme Court of Utah.

Nov. 12, 2004.

---

Mark Shurtleff, Att'y Gen., Kenneth A. Bronston, Asst. Att'y Gen., Salt Lake City, for plaintiff.

Margaret P. Lindsay, Patrick V. Lindsay, Provo, for defendant.

## ON CERTIORARI TO THE UTAH COURT OF APPEALS

NEHRING, Justice:

## INTRODUCTION

¶ 1 In this case, we consider the issue of whether a law enforcement officer conducted a constitutional warrantless search of an automobile. The search resulted in the discovery of cocaine and the conditional entry of a guilty plea by Angela Brake to attempted possession of a controlled substance. The trial court denied Ms. Brake's motion to suppress, challenging the lawfulness of the search. The court of appeals affirmed. We reverse.

## BACKGROUND

¶ 2 The legal analysis of search and seizure cases is highly fact dependent. *State v. Hansen*, 2002 UT 125, ¶ 5, 63 P.3d 650. We therefore begin with a full narration of the facts. On January 29, 2000, Sergeant Neil Castleberry was alone on patrol. He came upon two vehicles, a green sedan and a white truck, stopped in a pullout on West Geneva

Road between the Geneva Steel Plant and Utah Lake in Utah County. Sergeant Castleberry pulled in behind the vehicles to determine whether or not they needed assistance.

¶ 3 Sergeant Castleberry first approached the driver's side window of the sedan and spoke with a female who occupied the driver's seat. She told Sergeant Castleberry that she was fifteen years old. She said that the owner of the vehicle was in the back seat. Sergeant Castleberry then attempted to look into the interior of the vehicle. Although his view was obscured by fogged windows, he was able to determine that two people were in the back seat. Sergeant Castleberry then took a step back and opened the rear driver's side door to speak with the individual alleged to be the owner and driver of the vehicle. That person identified herself as Angela Brake, the defendant in this case.

¶ 4 Ms. Brake told Sergeant Castleberry that she, not the fifteen-year-old, had driven the vehicle, and the two had switched places after stopping at the pullout. At some point, she disclosed that the occupants of the vehicles were from Sanpete County, located some distance to the southeast of where the vehicles were parked. Sergeant Castleberry told Ms. Brake that he was concerned for the well-being of a young girl far away from home late at night—it was approximately 11:45 p.m.—in an area known to attract criminal activity. He indicated that she should be getting the fifteen-year-old home soon.

¶ 5 Sergeant Castleberry asked Ms. Brake for identification. She replied that her identification was in her purse and indicated that it was located in the front seat of the car. Ms. Brake offered to retrieve it. Sergeant Castleberry instructed Ms. Brake not to, and instead, he walked around the rear of the vehicle and opened the front passenger side door.

¶ 6 Sergeant Castleberry entered the car and reached for a purse resting on the front passenger seat. The purse he retrieved was not, in fact, Ms. Brake's, but rather belonged to a female occupant of the truck parked behind the sedan.[1] While in the vehicle,

1. Ms. Brake's purse was located elsewhere in the front passenger area of the sedan.

Sergeant Castleberry noticed a small white bindle resting on the front seat next to the purse. The bindle contained a white powdery substance which later tested positive as cocaine.

¶ 7 Sergeant Castleberry explained that his decision to enter the car and obtain the purse was based on several considerations, all relating to his safety: He wanted to secure the purse himself to "make sure there weren't any weapons," he was concerned about the number of individuals at the scene, a number he only later confirmed to be five, he was situated in an isolated area and it was late at night, and he did not want anyone other than himself to access any area of the vehicle outside of his control.

¶ 8 At the time Sergeant Castleberry entered the sedan, he had not made contact with any occupant of the truck, nor had he undertaken to determine how many people were in the truck. Upon discovering that the purse he had taken from the front seat belonged to an occupant of the truck, he walked toward it, both to investigate further the ownership of the purse and bindle and because he "was concerned to have [his] back toward the truck."

¶ 9 When Ms. Brake later admitted that the cocaine was hers, she was arrested. A subsequent search of the sedan uncovered drug paraphernalia. She was charged with possession of a controlled substance and unlawful possession of drug paraphernalia.

¶ 10 Ms. Brake moved to suppress the cocaine and her incriminating statements. The trial court denied Ms. Brake's motion to suppress the cocaine and granted her motion to suppress the incriminating statements. Addressing only the issue of the lawfulness of the search of the sedan, the court of appeals affirmed the trial court. *State v. Brake*, 2002 UT App 190, ¶ 1, 51 P.3d 31. We granted certiorari to review the court of appeals' holding that considerations of officer safety rendered Sergeant Castleberry's warrantless search of Ms. Brake's vehicle compatible with the Fourth Amendment to the United States Constitution.

## STANDARD OF REVIEW

¶ 11 On certiorari, we review the decision of the court of appeals and not that of the district court. *Longley v. Leucadia Fin. Corp.*, 2000 UT 69, ¶ 13, 9 P.3d 762. We conduct that review for correctness, ceding no deference to the court of appeals. *Grand County v. Rogers*, 2002 UT 25, ¶ 6, 44 P.3d 734. One of the components of the court of appeals's decision that we examine for correctness is the standard of review which it applied to the ruling of the trial court. *State v. James*, 2000 UT 80, ¶ 8, 13 P.3d 576.

¶ 12 Here, the court of appeals determined that it should apply the standard of review generally applicable to mixed questions of law and fact. A mixed question involves "the application of law to fact or, stated more fully, the determination of whether a given set of facts comes within the reach of a given rule of law." *State v. Pena*, 869 P.2d 932, 936 (Utah 1994). As understood and applied by the court of appeals in this case, under that standard " '[a] trial court's factual findings are reviewed deferentially under the clearly erroneous standard, and its conclusions of law are reviewed for correctness with some discretion given to the application of the legal standards to the underlying factual findings.' " *Brake*, 2002 UT App 190 at ¶ 11, 51 P.3d 31 (quoting *State v. Loya*, 2001 UT App 3, ¶ 6, 18 P.3d 1116). Because the standard of review applied by the court of appeals conflicts with our recent pronouncements on the proper standard of review in search and seizure cases, we take this opportunity to explain and clarify this point of law.

¶ 13 The topic of standard of review involving mixed questions of law and fact recalls the metaphor of the judicial pasture used by Chief Justice Zimmerman in *Pena*, 869 P.2d at 937 (citing Maurice Rosenberg, *Judicial Discretion of the Trial Court, Viewed From Above*, 22 Syracuse L.Rev. 635 (1971)). The pasture is judicial discretion, and is bounded by fences which reduce or enlarge access to the available crop of discretion based on the nature of the matter which a judge is called upon to decide. For example, the fence line is long for pure questions of fact and narrow for questions of law corresponding to the

"clearly erroneous and correction-of-error standards," respectively. *Id.* Mixed questions of law and fact comprise a third category which challenge those responsible for placing the fence lines along the spectrum of discretion. Conceding that parceling out judicial discretion in the realm of mixed questions of law and fact "raises thorny issues," *id.*, Chief Justice Zimmerman concluded that "[t]he best we can do is to recognize that such a spectrum of discretion exists and that the closeness of appellate review of the application of law to fact actually runs the entire length of this spectrum," *id.* at 938.

¶ 14 Considerations of policy play a central part in the placement of discretionary fences. Chief Justice Zimmerman singled out as an example of this phenomenon our determination to treat without deference trial court rulings involving the legality of consent to a search in *State v. Thurman*, 846 P.2d 1256 (Utah 1993). He described the policy considerations this way:

> [I]n *Thurman*, we found that while there were varying fact patterns that would be relevant to determinations of voluntariness of consent, they were not so unmanageable in their variety as to outweigh the interest in having uniform legal rules regarding consent to search, given the substantial Fourth Amendment interests lost as a result of such consents.

*Pena*, 869 P.2d at 939 (citing *Thurman*, 846 P.2d at 1271).

¶ 15 At the time the court of appeals issued its opinion in this case, we had not expressly extended that non-deferential standard of review beyond consents to search and seizure cases generally. *Thurman*, 846 P.2d at 1269–71. We soon, however, expanded the reach of the *Thurman* standard of review. In *State v. Hansen*, 2002 UT 125, ¶¶ 48, 51, 63 P.3d 650, we held in the context of a search incident to a traffic stop that consent is a factual finding subject to review

under a clearly erroneous standard, that the determination of voluntariness is a legal question reviewed for correctness, and that the application of law to fact necessary to determine the legality of a search was reviewed for correctness. We then announced our intention to apply a non-deferential standard in reviewing the reasonableness of a traffic stop and protective search, or "*Terry* frisk." *State v. Warren*, 2003 UT 36, ¶ 1, 78 P.3d 590. In neither instance did we make note that we had altered existing law relating the proper standard of review to apply. We take the occasion to do so now. We abandon the standard which extended "some deference" to the application of law to the underlying factual findings in search and seizure cases in favor of non-deferential review.

## ANALYSIS

■ ¶ 16 A majority of the court of appeals held the search of Ms. Brake's vehicle to be lawful, basing its holding on concerns for police officer safety. *State v. Brake*, 2002 UT App 190, ¶ 26, 51 P.3d 31. Turning away from Utah case authority bearing on the issue of when considerations of police officer safety can justify a warrantless search of an automobile, the court of appeals drew analytical guidance exclusively from the United States Supreme Court's opinion in *New York v. Class*, 475 U.S. 106, 106–09, 117–18, 106 S.Ct. 960, 89 L.Ed.2d 81 (1986). *Brake*, 2002 UT App 190 at ¶¶ 18–22, 51 P.3d 31. By contrast, Judge Orme's dissenting opinion measured Sergeant Castleberry's search against Utah law defining the scope of authority to search the interior of an automobile for weapons during an investigatory stop and found inadequate justification for it.[2] *Id.* at ¶¶ 29–31.

¶ 17 We disagree with the court of appeals's reliance on *Class*. For reasons we will speak to shortly, we conclude that *Class* subverts the workable principles found in

---

2. The fact that the court of appeals panel split over the question of whether to conduct its analysis under federal law, *Class*, or Utah case authority carries with it the implicit invitation to revisit the dormant but unresolved debate in this court over the merits of whether and when to depart from federal Fourth Amendment doctrine and chart our own course in the realm of search and seizure law based on the protections afforded by article I, section 14 of the Utah Constitution. *State v. Anderson*, 910 P.2d 1229, 1234–37 (Utah 1996); *State v. Larocco*, 794 P.2d 460, 469–70 (Utah 1990). This case does not challenge the search as a violation of the Utah Constitution, and we will not therefore revive the debate here.

Utah law which preserve the integrity of the interior of an automobile against unreasonable searches while recognizing the dangers to law enforcement officers associated with traffic stops. Moreover, because of the unique factual circumstances surrounding *Class* and its protean holding, it cannot offer coherent direction to law enforcement and judges.

¶ 18 The court of appeals turned to *Class* because it appeared to aptly fit a circumstance involving both safety considerations and a limited intrusion in the context of acquiring identifying information. *Class* began with a traffic stop. 475 U.S. at 108, 106 S.Ct. 960. The driver exited the car. *Id.* An officer looking for the vehicle identification number (VIN) mounted on the dashboard discovered that it was covered by papers. *Id.* He reached into the car to expose the VIN and noticed the handle of a gun protruding from beneath the driver's seat. *Id.* The United States Supreme Court found the intrusion lawful in a 5–4 decision in which the plurality opinion attracted the votes of only three justices. *Id.* at 118–19, 106 S.Ct. 960.

¶ 19 The plurality in *Class* applied a test in which the reasonableness of the intrusion was measured against the expectation of privacy afforded the target of the intrusion, the degree to which the intrusion was focused on and limited to its target, and a generalized concern for police officer safety. *Id.* at 115–16, 106 S.Ct. 960. The Court found that the driver had no expectation of privacy in the VIN; the act of reaching into the vehicle to move the papers concealing the VIN, while a constitutionally protected search, was focused and limited. *Id.* at 118–19, 106 S.Ct. 960. This combination of circumstances rendered the search and seizure of the gun reasonable. *Id.*

¶ 20 The court of appeals majority found close parallels between the facts in *Class* and the events surrounding the search of Ms. Brake's vehicle. *Brake,* 2002 UT App 190 at ¶ 24, 51 P.3d 31. The majority impliedly considered the VIN to be similar in nature to the personal identification Sergeant Castleberry was entitled to examine as part of an investigatory stop. *Id.* at ¶ 25. The court of appeals determined that Sergeant Castleber-

ry's search of the front seat for the purse was, like the *Class* intrusion to uncover the VIN, " 'focused in its objective and no more intrusive than necessary to fulfill that objective.' " *Id.* at ¶ 26 (quoting *Class,* 475 U.S. at 118, 106 S.Ct. 960). Taken together, the legitimate interest in acquiring Ms. Brake's identification and minimal intrusion undertaken to obtain it lawfully served the interest in preserving the officer's safety.

¶ 21 The use of officer safety as a justification for a warrantless search is central to our review of the court of appeals's decision. The majority conceded that, absent safety considerations, Sergeant Castleberry's search would have been unlawful under the authority of *State v. Schlosser,* 774 P.2d 1132 (Utah 1989). *Brake,* 2002 UT App 190 at ¶¶ 16–17, 51 P.3d 31. In *Schlosser,* we held unconstitutional a Utah Highway Patrol trooper's search of the interior of a vehicle after observing furtive movements by the driver which led the trooper to believe that the driver "was trying to hide something." 774 P.2d at 1134. The trooper did not cite safety concerns to justify his search. According to the court of appeals majority, Sergeant Castleberry's expression of concern for his safety placed the case within the reach of *Class. Brake,* 2002 UT App 190 at ¶ 18, 51 P.3d 31 (citing *Class,* 475 U.S. at 117–18, 106 S.Ct. 960). We disagree.

¶ 22 Like the trooper in *Schlosser,* the officers who conducted the stop and search in *Class* did not cite safety concerns as a justification for the search. Rather, the discovery of the gun in the *Class* vehicle triggered an understandable, but post hoc, justification of the search based on safety concerns. *Class,* 475 U.S. at 118–19, 106 S.Ct. 960. Put another way, while *Class* is susceptible to many interpretations, it clearly does not stand for the proposition that an officer may assume that a weapon is concealed in the interior of every vehicle stopped for a traffic violation and that the officer may, justified by the concern for his safety grounded in that assumption, lawfully conduct a warrantless search to obtain driver and vehicle identification. Such a reading would be at odds with a well-developed body of law which recognizes the inherent dangers of traffic encounters

and responds to those dangers by permitting law enforcement officers to take measures to protect their safety without risk of violating constitutional protections. *State v. Warren*, 2003 UT 36, ¶ 1, 78 P.3d 590.

¶ 23 The State properly reminds us in its brief of the very real perils confronted by law enforcement officers in executing traffic stops, citing evidence, for example, that in 1994, nationwide, 5672 officers were assaulted and eleven were killed in traffic pursuits and stops. *Maryland v. Wilson*, 519 U.S. 408, 413, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997).

¶ 24 Our recognition of these risks has contributed to our search and seizure jurisprudence in two ways. First, safety concerns influence the range of conduct officers are permitted to perform under the so-called "automobile exception" to the requirement that a warrant be secured before conducting a search. This general recognition of the risks inherent in traffic stops permits an officer to order a driver and passengers to exit a vehicle during a traffic encounter. The officer may also run a background check based only on a subjective assessment of safety risk. *Id.* at 410, 117 S.Ct. 882; *Pennsylvania v. Mimms*, 434 U.S. 106, 108–11, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977); *United States v. Holt*, 264 F.3d 1215, 1221 (10th Cir.2001).

¶ 25 The danger inherent in traffic stops does not, however, justify the warrantless search of the interior of a vehicle. Under Utah law, a warrantless automobile search requires probable cause and exigent circumstances unless it satisfies traditionally recognized justifications of protecting the safety of police or the public or preventing the destruction of evidence. *State v. Larocco*, 794 P.2d 460, 469–70 (Utah 1990); *see also State v. Christensen*, 676 P.2d 408, 412 (Utah 1984); *State v. Limb*, 581 P.2d 142, 144 (Utah 1978).

¶ 26 Officer safety concerns that satisfy the requirements for a warrantless search are more exacting than the safety risks inherent in every traffic encounter. Drawing on the United States Supreme Court's authority in *Michigan v. Long*, 463 U.S. 1032,

103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), our court of appeals has adopted, and we now ratify, an alternative approach, often referred to as a "weapons search," in which a search will be valid only if the officer reasonably believes both that the suspect is dangerous, and that he may obtain immediate control of weapons. *State v. Chapman*, 921 P.2d 446, 454 (Utah 1996) (holding that the officer's belief can originate either in the officer's contemporaneous observations or in the inherent nature of the underlying offense); *State v. Bradford*, 839 P.2d 866, 869 (Utah Ct.App.1992); *see also State v. Roybal*, 716 P.2d 291, 293 (Utah 1986) (citing *Terry v. Ohio*, 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (holding that a search is justified only if " 'a reasonably prudent [person] in the circumstances would be warranted in the belief that his safety ... was in danger' ")).

¶ 27 *Class* is incompatible with the weapons search approach. Its result does not depend on any articulation of potential threat to officer safety, nor does it offer sound guidance to officers making automobile stops. Instead, it owes its outcome to a sliding scale assessment of factors that bear on the reasonableness of the search, including expectation of privacy, degree of intrusion, the governmental interest alleged to justify the intrusion, and an after-the-fact evaluation of risk to officer safety.

¶ 28 The factual setting and structure of the plurality opinion in *Class* strongly point to a result-driven outcome. The discovered firearm was an indisputable safety risk. With the benefit of hindsight, it would have been nonsensical to allow the driver to return to the car to move the papers obscuring the VIN and thereby placing him within reach of his weapon. Bowing to this reality, the Court anchored itself, albeit tenuously, to the purpose and positioning of the VIN and erected its precarious scaffolding of justifying factors. By the time it reached the gun, the Court's reasoning had become highly cantilevered and barely able to support the weight of its outcome. It is not an architecture easily transferred to other factual environments.

¶ 29 Indeed, were we to adopt *Class* under the facts in this case, it would be difficult to imagine any circumstance where a police officer would not be justified in searching a car's interior since it would always be safer for an officer to search the car herself than to ask for non-visible information, such as a driver's license.

¶ 30 Moreover, this sliding scale approach has the untoward practical effect of complicating police officer decision-making during the course of an automobile stop. We do not in any way belittle the skill and intelligence of a law enforcement officer in holding the view that an officer cannot be expected to immediately calculate potential risks to her safety while assessing and balancing a suspect's reasonable expectation of privacy and the permissible scope of warrantless intrusion in light of that privacy interest.

¶ 31 Accordingly, we reject *Class* as the appropriate analytical framework here. Instead, we embrace as providing clear guidance to officers the exigent circumstances relating to safety articulated in *Long* and adopted by our court of appeals in *Bradford.* Unlike the multi-faceted calculus demanded of an officer under the *Class* test, the weapons search exception focuses the attention of an officer more directly on safety considerations in evaluating the risks present in a traffic stop.

¶ 32 The weapons search approach also preserves the practical benefits derived by the similarities between the judgments required of law enforcement to justify a *Terry* frisk and those relevant to a weapons search. *See Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). A traditional *Terry* frisk requires that the officer have a reasonable, articulable suspicion that the suspect is armed and dangerous. *Id.* at 21–23, 88 S.Ct. 1868. We have previously stated that " 'reasonable suspicion requires an objectively reasonable belief that an individual is engaged in or is about to be engaged in criminal activity.' " *Pena,* 869 P.2d at 940 (quoting *United States v. Place,* 462 U.S. 696, 702–03, 103 S.Ct. 2637, 77 L.Ed.2d

110 (1983)). In some cases, the circumstances surrounding the suspect may trigger the officer's reasonable suspicion, such as seeing a bulge that appears to be a weapon. In other cases, the nature of the crime being investigated is sufficient to trigger the officer's reasonable suspicion, such as a murder or robbery. However, we agree with our court of appeals that " 'for other types of crimes, such as trafficking in small quantities of narcotics, possession of marijuana, … underage drinking, driving under the influence and lesser traffic offenses, minor assault without weapons, or vagrancy,' there must be particular facts which lead the officer to believe that a suspect is armed." *State v. Warren,* 2001 UT App 346, ¶ 15, 37 P.3d 270 (quoting Wayne R. LaFave, 4 *Search and Seizure* § 9.5(a), at 255–56 (3d ed.1996)). Thus, the weapons exception ensures that an officer will search a vehicle for weapons only upon the appropriate level of a reasonable, articulable suspicion drawn from the officer's observations or from the inherent nature of the underlying offense. *Brake,* 2002 UT App 190 at ¶ 29, 51 P.3d 31 (Orme, J., dissenting) (citing *Chapman,* 921 P.2d at 454).

¶ 33 We now turn to Sergeant Castleberry's search of Ms. Brake's vehicle. We begin by reviewing the facts upon which the court of appeals relied to determine whether the totality of the circumstances properly left Sergeant Castleberry with reasonable, articulable suspicion that weapons were present.

¶ 34 The vehicles were parked in a "desolate and frequent crime area." *Brake,* 2002 UT App 190 at ¶ 25, 51 P.3d 31. It was late at night, dark, and there was no one else around. *Id.* at ¶ 2. The purse itself was located in a dark area of the vehicle. *Id.* at ¶ 25. Further, the individual sitting in the driver's seat did not possess a driver's license. *Id.*

¶ 35 However, some of the facts relied upon by the court of appeals are chronologically inconsistent with the testimony of Sergeant Castleberry.[3] For example, in describing the circumstances that caused Ser-

---

**3.** The facts as recited by the court of appeals in its fact section are inconsistent with the facts as relied upon by the court of appeals in its analysis. We rely upon the facts as ascertained by our own review of the record, consistent with the court of appeals's fact section.

geant Castleberry to think there might be weapons present, the court of appeals states that he "discovered that . . . due to the darkness and fogged up windows, he was unable to see clearly into the Nissan's backseat to identify the passengers sitting in the backseat." *Id.* This was true when Sergeant Castleberry approached the vehicles, but it was no longer true at the time he searched for Ms. Brake's purse. When he opened the front passenger door to obtain Ms. Brake's purse, Sergeant Castleberry had already opened the back door and spoken to a male and a female. *Id.* at ¶¶ 4–5. Thus, by the time Sergeant Castleberry searched for Ms. Brake's purse, he had clearly viewed the back seat and knew the number of occupants in Ms. Brake's vehicle.

¶ 36 The court of appeals also stated that Sergeant Castleberry "discovered that . . . the individuals in both vehicles totaled five." *Id.* at ¶ 25. This, too, is inconsistent with the true sequence of events. Sergeant Castleberry testified that he did not approach the second vehicle until after he had already removed the bindle from Ms. Brake's vehicle. *Id.* at ¶ 6. Only at that time did he discover the number of persons in the second vehicle. Had Sergeant Castleberry thought that the occupants of the truck posed a risk sufficient to justify his warrantless search of Ms. Brake's vehicle, he likely would have made contact with them to ascertain their number before entering Ms. Brake's passenger compartment. Thus, neither the unidentified passengers in the backseat of the sedan nor the number of total persons present can be considered suspicious, as those facts were not an issue at the time Sergeant Castleberry searched Ms. Brake's vehicle for her purse.

¶ 37 Having eliminated these two factors, we consider the circumstances that were present at the time Sergeant Castleberry searched Ms. Brake's vehicle. The suspicion-arousing environmental factors present at the time are limited: It was dark, late at night, desolate, there were two vehicles with their engines running, and one of the vehicles had three occupants, an under-age driver and a male and a female in the backseat. The location was also one which attracted unspecified criminal activity, although nothing rea-

sonably implied that the occupants of the vehicles were engaging in criminal activity of a type that would place Sergeant Castleberry at risk. Nothing suggested the presence of weapons. Sergeant Castleberry did not see any weapons, nor did he observe any furtive movements or behavior consistent with the retrieval of a weapon. He made no observations that might have suggested to him that a weapon was, in fact, nearby. Likewise, nothing inherent in the situation of an under-age driver or a driver possibly needing help necessarily suggested the presence of weapons.

¶ 38 Accordingly, when considering the totality of the circumstances, we cannot conclude that the lateness of the hour, the lack of light, the running engines, and the identity of the occupants gave Sergeant Castleberry a reasonable, articulable suspicion that weapons might have been present. In the absence of more suspicious circumstances, Sergeant Castleberry's warrantless search under the auspices of searching for weapons was unlawful.

### CONCLUSION

¶ 39 Applying the weapons search doctrine to the facts of this case leads us to conclude, as did Judge Orme in his dissenting opinion, that Sergeant Castleberry's warrantless search of Ms. Brake's vehicle was invalid. We reverse the determination of the court of appeals that Sergeant Castleberry's search of Ms. Brake's vehicle was lawful and remand to the trial court for proceedings consistent with this opinion and Ms. Brake's conditional guilty plea.

¶ 40 Chief Justice DURHAM, Associate Chief Justice, WILKINS, Justice DURRANT, and Justice PARRISH concur in Justice NEHRING's opinion.